Filed 3/29/16  In re N.T. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re N.T., et al., Persons Coming Under the Juvenile Court Law. | |
| | D068805 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14744A-B) |
| v. | |
| NINA S. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, Blaine K. Bowman, Judge.  Affirmed.

Lelah S. Fisher, under appointment by the Court of Appeal, for Appellant Nina S.

Linda Rehm, under appointment by the Court of Appeal, for Appellant Brian T.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and C. Ellen Pilsecker, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego, Tilisha Martin, Carolyn Levenberg and Ray Diaz for Minors.

Following a two and one-half year dependency case during which N.T. and E.T. were removed from parental custody three times, the juvenile court terminated the parental rights of Nina S. (mother) and Brian T. (father) under Welfare and Institutions Code section 366.26[1] and selected adoption as the children's permanent plan. The mother contends the court erred in finding there was not a beneficial parent-child relationship between her and her children that precluded termination of her parental rights. (See § 366.26, subd. (c)(1)(B)(i).) The father joined in the mother's briefing and contends only that if we reverse the termination of her parental rights, we must also reverse the termination of his.[2] (Cal. Rules of Court, rule 5.725(a)(2).) We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The First Removal (November 2012)*

On November 16, 2012, three-year-old N.T. and her two-year-old sister E.T. were detained in foster care after police found the family's mobile home unsafe and unlivable. The parents admitted the trailer was not safe for children.

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Because the father does not assert independent grounds of error, we discuss him only as relevant to the mother's claims of error.

The mother smelled of alcohol, her speech was slurred, and her thoughts were disorganized. N.T. informed a social worker that the mother buys vodka, and the father drinks beer and vodka. N.T. also reported that the mother kicks the father's legs, and the father "is mean" and hits the mother in the face. The children were detained and placed in foster care, and the parents were arrested for being under the influence and for child endangerment. The parents denied any domestic violence. The mother also denied using drugs, while the father admitted to weekly marijuana use outside the children's presence.[3]

The San Diego County Health and Human Services Agency (Agency) filed petitions asserting claims (as relevant here) under section 300, subdivision (b) arising from the family's living conditions and the father's drug use. The court ordered that the children be detained out of parental custody and that the parents receive reunification services.

*The Second Removal (February 2013)*

The parents eventually found suitable housing. On January 3, 2013, the juvenile court gave the Agency discretion to detain the children with the mother on the condition that the father move out of the family home. The father moved out, and the children were detained with the mother. The Agency recommended the juvenile court dismiss the petitions without prejudice.

---

[3] The father later tested positive for amphetamines, methamphetamines, and cannabinoids. The mother tested negative for drugs.

About two weeks later, the Agency changed its recommendation. The mother had just been arrested for public intoxication while she and the children were leaving a store in Santa Barbara County. The mother intended to drive with the children to a nearby hotel where the father was waiting for them. In the mother's car, deputies found an open bottle of vodka with a straw in it, a receipt indicating the vodka had been purchased that day, and a marijuana pipe.

The children were taken into protective custody and transported back to San Diego. E.T. cried for her mother for more than two hours during the drive; N.T. cried for part of that time. The children were returned to their previous foster home.

The Agency filed amended petitions adding allegations under section 300, subdivision (b) arising from the mother's arrest and intoxication. The juvenile court ordered the children detained out of parental custody pending a contested jurisdiction and disposition hearing.

At the jurisdiction and disposition hearing, the court dismissed the count and allegations arising from the unsafe living conditions and found true the counts arising from the parents' substance abuse.

*Six-Month Review (November 2013)*

In its six-month review status report, the Agency reported the mother had only "partially participated in reunification services"—she had not demonstrated progress in therapy, provided updated progress reports from her drug treatment programs, or submitted to all Agency-requested drug tests. She was visiting the children twice per

week, supervised by the foster mother. The Agency characterized the interactions between the mother and the children as "positive."

*Twelve-Month Review (January 2014)*

The Agency's twelve-month status review report informed the juvenile court of the mother's continued partial participation in services. She was attending outpatient substance abuse treatment, but her participation was lacking.

A self-proclaimed "family friend" who had stayed with the parents for 30 days reported to the Agency that the mother was a " 'closet drinker' " with "a serious drinking problem." He also reported the parents engaged in domestic violence. The mother told the Agency not to believe the friend because he has mental health issues and is an "expert con-artist."

The mother continued having supervised visits with the children, during which she behaved appropriately and lovingly. In April, the Agency reported the mother had progressed to one two- to four-hour unsupervised visit.

*Settlement/Pretrial Conference (May 2014)*

In May 2014, the Agency reported that the mother was continuing in her substance abuse treatment, but she denied having a problem. She was testing negative, but did not submit to three Agency-requested tests.

The mother had progressed to eight-hour unsupervised visits. She appeared to be compliant about the father not visiting during her unsupervised visits. According to the mother, the father had "disappeared." However, the foster mother advised the Agency

5

that she sometimes heard the father in the background during phone calls and saw the parents together at the church they all attended.

N.T. told the Agency her visits with the mother are " '[g]ood.' "  However, the foster mother reported that the children appeared to be detaching from the parents because they no longer sat together during church and the children were having bathroom accidents after visits.  The foster mother also reported that the mother was not taking advantage of the full eight-hour visitation opportunity—the mother usually called after just two or three hours to ask that the foster mother pick up the children.  The Agency advised the mother she needed to complete regular eight-hour visits to transition the children back into her care.

*The Third Removal (August 2014)*

In July 2014, the Agency recommended the children be placed with the mother.  She had successfully completed her outpatient substance abuse treatment program.  She had leased a suitable residence, and the landlord confirmed no one lived with her.  And she had consistently visited the children at her residence for eight hours.  Despite N.T.'s concern that the mother would get " 'drunk' " on overnight visits, the mother successfully completed them.

On July 3, 2014, the mother began a 60-day trial visit.  On July 9, the court restored physical custody to the mother, terminated reunification services to the father, and ordered that the mother not supervise the father's visits.

However, before the mother successfully completed the trial period, the Agency again removed the children and filed new petitions.  On August 28, 2014, an Agency

social worker learned during an unannounced visit to N.T. at her school that the father was living with the mother and the children. N.T. also told the social worker about a domestic violence incident that had occurred the night before when the parents were " 'drunk.' " N.T. said the father (1) pushed the mother into a window, which broke the glass and cut the mother's arm; and (2) threw a Chihuahua at N.T.

The mother admitted to a social worker that she had consumed alcohol three days before the unannounced visit to N.T.'s school.[4] The Agency asked the mother to drug test, but she did not comply. The mother denied the father was " 'living' " with her; she claimed he was " 'just staying' " there. The mother acknowledged to the social worker that drinking alcohol and allowing the father to have contact with the children were not permitted under her case plan. The children were removed and placed with their original foster mother's daughter.

The Agency initially recommended liberal supervised visits. However, after the mother missed several scheduled visits, which disappointed the children, the Agency recommended terminating the mother's reunification services and setting a section 366.26 hearing. The juvenile court ordered the children removed from the mother and scheduled a section 366.26 hearing. Neither parent received further services.

---

4    N.T.'s teacher advised the social worker that the mother's breath smelled so strongly of alcohol when they had met a few days before the unannounced visit that the teacher followed her into the parking lot to ensure she would not be driving. The teacher saw her get into a car being driven by someone else.

*Visits Between October 2014 and April 2015*

In October 2014, the mother appeared to be under the influence of alcohol during one visit. The Agency asked her to drug test, but she refused. On a separate occasion, the mother smelled of alcohol and had red eyes during a meeting at the Agency's office.

In November 2014, the Agency reported the mother had one good visit with the children. However, the foster mother stated the mother became verbally combative during one visit when the mother would not help clean up or instruct the children to do so. During phone calls with the children, the mother discussed the dependency case with them.

In December 2014, the Agency reported the children had a positive visit with the mother, but noted that "[t]he caregiver typically has to discipline the children during the visits, as the mother does not."

In January 2015, the Agency reported the children seemed excited to see their mother during visits, but "just as easily conclude[d] the visit to return to their caregivers." The mother had been calling the girls regularly in the evenings, but her calls "dwindled." N.T. wanted the foster mother to stay near her during visits, and stated she did not want to attend one visit. E.T. appeared to enjoy the visits. The mother did not pursue any services for substance abuse or domestic violence, and she did not submit to five Agency-requested drug tests over the preceding months.

In February 2015, the foster mother reported several concerns about the mother's visits: both children called their mother by her first name; N.T. asked to skip all visits (though E.T. was "fine" with them); the children would only speak by phone with the

mother if the foster mother bribed them (and even then, the calls lasted only about one minute); the mother could not keep the children calm during the visits, requiring intervention by security guards; the mother appeared slightly intoxicated during visits; the mother asked the foster mother to select parent-child activities for the visits; the mother frequently favored E.T. over N.T. "to the point [where] there is a lot of jealousy and sibling rivalry" that "follows the girls home and affects their relationship"; and the mother was " 'Ril[ing] the girls up' " at the end of visits by asking for additional hugs and kisses.

A social worker also reported concerns with the mother's visits in February. The mother removed N.T.'s eye patch "despite being told that it needed to stay on for two hours after school every day"; the mother disregarded the social worker's requests to clean up at the end of one visit; and the mother "continued to try to 'steal kisses' from the children." Also, N.T. stated, "I don't want to come [to visits] anymore."

In March 2015, the Agency reported the children were becoming less interested in visiting the mother. They no longer wanted to go to weekly Hebrew school, where their mother would tell them she would visit them; they only asked to call their mother when they wanted her to buy them something; and N.T. stated she did not want to see or speak with the mother anymore, and suffered panic attacks after some visits. On one occasion, the mother disrupted the children's visit with the father because she saw him bring a girlfriend to his visit. The foster mother told the Agency she was no longer willing to supervise the mother's visits because the mother was lying about the Agency authorizing extra visits and phone calls that were not truly authorized.

9

In April 2015, N.T. still did not want to visit the mother and was reluctant to interact with her during visits.  E.T. appeared to enjoy the visits, was affectionate with the mother, and would cling to her when visits ended.  The Agency reported that the children and the mother participated in a bonding study, but the appellate record does not indicate its outcome.

*Mother's Section 388 Petition and Agency's Section 366.26 Report*

In May 2015, the mother filed a petition under section 388 requesting that the court either return the children to her custody or provide additional reunification services.[5]

The Agency opposed the mother's petition and submitted a report and addenda in preparation for the section 366.26 hearing.  The Agency recommended the juvenile court terminate parental rights and select adoption as the children's permanent plan.  The foster mother, maternal grandparents, and maternal aunt and uncle all were willing to adopt the children.

The Agency advised that when the children were asked if they wish to return to the mother, they said " '[n]o' "—they would rather stay with the foster mother.  N.T. stated she did not want to visit the mother " '[b]ecause I don't need her anymore.' "  The children, "unlike highly bonded children," had begun calling their foster mother " 'mom' "—conduct the mother was "quick to correct" when it occurred during visits.

---

5    Under section 388, a parent may petition to change or set aside a prior order based on a showing of (1) changed circumstances or new evidence, and (2) the promotion of the child's best interests.  (§ 388; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1157 (*G.B.*).)

10

These factors led a social worker to opine "it is clear that a strong parental bond does not exist in this case."

The Agency reported that the mother's landlords advised that they had seen the mother drinking alcohol outside her home, sometimes with the father.

The Agency expressed concern for the mother's lack of stable housing: "Throughout the life of the case . . . , the mother has moved countless times, and has not appeared to live in one place for more than six months." This led the Agency to conclude "[t]he mother is unable to care for herself, even without the responsibly of caring for children. For example, the mother is working several jobs, yet is unable to maintain a stable residence as she has not paid for her rent in July 2015 and is potentially facing eviction."

The Agency reported the maternal aunt and uncle had been approved for interstate placement. N.T. appeared happy to learn that they wanted to adopt her; she did not want to return to her parents. E.T. expressed a desire to live with the mother again; when asked about living with her aunt and uncle, she told the social worker she was "done" and left the room.

The Agency reiterated its recommendation that the court select adoption as children's permanent plan, stating: "there is not a strong enough relationship between the children and their parents to say that the parent-child relationship outweighs the benefits of adoption. [N.T.] made it clear . . . that she does not want to live with her parents, nor does she want to visit with them. [E.T.] appears to have a more favorable relationship with her parents than [N.T.] However, the absence of living with her parents has not

11

caused her any detrimental effects. [E.T.] has spent more than half her life in foster care . . . . [N.T.] has spent approximately a third of her life in foster care. Neither parent has demonstrated a parental role with the children. A parental role arises out of engaging in parenting behaviors on a day-to-day basis. A parental role also arises out of providing a child with a sense of love, safety, and security. While these parents may love their children, they have not provided them with safety and security."

The juvenile court made a prima facie finding on the mother's section 388 petition and set an evidentiary hearing to coincide with the section 366.26 hearing.

*The Hearing*

After hearing testimony from a social worker, the mother, and the mother's rabbi's wife, the trial court denied the mother's section 388 petition, terminated both parents' parental rights, and ordered adoption as the children's permanent plan.[6]

The court explained it denied the section 388 petition because the mother had demonstrated neither changed circumstances nor promotion of the children's best interests. The court explained, in light of the children's numerous removals during the course of the dependency case, "[t]hese poor kids need to have some permanence in their life."

As for its selection of adoption as the children's permanent plan, the court concluded that although the mother had maintained regular visitation with the children, the parental bond did not outweigh the benefits of adoption. The court elaborated, "I

---

6       The mother does not challenge the juvenile court's ruling on her section 388 petition.

12

think that the children, based on their comments, have made it clear that they do want some permanency. . . . [¶] They've spent a lot of time in foster care and it's time for that to end. They need some permanence. And I keep repeating myself, but I look at this case and it's absolutely clear they need some permanency in their [lives] which they haven't had at this point."

## DISCUSSION

The mother contends the juvenile court erred in finding there was not a beneficial parent-child relationship between her and her children within the meaning of section 366.26, subdivision (c)(1)(B)(i) that precluded the termination of her parental rights. We disagree.

### I. *Relevant Legal Principles*

" 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.] 'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). [Citations.] Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." ' " (*G.B., supra*, 227 Cal.App.4th at p. 1165.)

13

This court has interpreted "the 'benefit from continuing the parent[-]child relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

"A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence. [Citation.] It is not enough to show that the parent and child have a friendly and loving relationship. [Citation.] ' "Interaction between [a] natural parent and child will always confer some incidental benefit to the child . . . ." ' [Citation.] For the exception to apply, 'a *parental* relationship is necessary. . . .' [Citation.] ' "While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent.". . .' " (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights

14

will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)

## II. *Analysis*

The juvenile court found the mother carried her burden of establishing she "maintained regular visitation and contact" with the children. (§ 366.26, subd. (c)(1)(B)(i).) Therefore, we need only consider whether the court abused its discretion in determining the benefits of continuing the mother's parental relationship outweighed the benefits of a permanent plan of adoption. (See *Autumn H., supra*, 27 Cal.App.4th at p. 575.) We find no abuse of discretion.

First, as the Agency opined, the juvenile court could correctly conclude "there is not a strong enough relationship between the children and their parents to say that the parent-child relationship outweighs the benefits of adoption." "[U]nlike highly bonded children," the children called their foster mother " 'mom' " and the mother " 'Nina.' " N.T. stated she did not " 'need' " the mother, and the mother acknowledges in her briefing that N.T. was "walling herself off from the mother."[7] And although the Agency recognized

---

7    The mother offers a variety of psychological theories for why N.T. might have been doing so. For example, she asserts N.T. "needed control over her circumstances. . . . One way to get that control was to distance herself emotionally from her mother, whom

15

some of the mother's visits with the children were positive, the Agency also noted many aspects in which the mother did not fulfill a *parental* role. For example, the mother appeared to favor E.T. during visits, which created sibling rivalry that continued after visits; the mother could not keep the children calm during some visits; the mother sometimes asked the foster mother to select parent-child activities for the visits; the mother removed N.T.'s eye patch; the mother disregarded requests to clean up at the end of visits; the mother "[r]il[ed] the girls up" at the end of visits; and the "[t]he caregiver typically ha[d] to discipline the children during the visits, as the mother [did] not."

In contrast to these concerns, the mother asserts she "consistently played the parental role" because she fed the children healthy food; she was affectionate with them, and they were with her; she kept the children engaged with age-appropriate activities; and supplied them with clothes and other items. In the context of the concerns discussed above, the juvenile court did not abuse its discretion in concluding the mother had not met her burden of establishing that any detriment the children might suffer as a result of the parental relationship being terminated outweighed the benefits of a permanent plan of adoption.

Second, the juvenile court did not err in concluding it is "absolutely clear" the children "need some permanency in their [lives] which they haven't had at this point."

she had always loved and been excited to see." The mother also asserts, "The amount of time [N.T.] spent with mother decreased more and more over time, and the less time [N.T.] saw her, the more she expressed the desire not to see mother again. . . . The logical explanation for this is that it was simply too painful." While we agree with the mother that expert opinion generally is not required to establish the beneficial relationship exception, it would have been useful here to support these (and other) otherwise-speculative psychological theories.

The children were removed from parental custody three times over the course of about two years and spent significant portions of their young lives out of their mother's care. N.T. spent approximately one-third of her life out of her mother's custody, and had no desire to be returned. E.T. spent approximately half of her life out of her mother's custody. The mother was in denial about her substance abuse and domestic violence issues and how they impacted the children. She continued drinking alcohol throughout the course of the dependency case; she appeared intoxicated during several visits with the children and during meetings with the Agency and N.T.'s teacher; and she did not comply with numerous Agency requests to drug test. The mother also violated her case plan and the juvenile court's orders by exposing the children to the father, who abused the mother in the children's presence and threw a dog at N.T.

The juvenile court did not abuse its discretion in concluding the beneficial relationship exception did not apply. Because the father's argument is premised on the mother establishing this exception, and because we have rejected her argument, the father's claim of error also fails.

DISPOSITION

The orders are affirmed.

HALLER, J.

WE CONCUR:

NARES, Acting P. J.

McDONALD, J.

18